### PORTER v. CRADDOCK et al.
#### No. 444.

United States District Court
W. D. Kentucky, Paducah Division.

June 24, 1949.

Nat Ryan Hughes, Murray, Kentucky, for plaintiff.

Fisher & Reed, Paducah, Kentucky, for defendants.

SHELBOURNE, Chief Judge.

Alleging the requisite diversity of citizenship and seeking to recover in this civil action $6,331.72 in judgment, the plaintiff, a resident of Little Rock, Arkansas, instituted this action against the defendants, husband and wife, residing in the Western District of Kentucky.

Plaintiff alleges that the defendants were partners engaged in conducting a food preserving plant and in the sale of its products; that by contract entered into November 18, 1946, plaintiff purchased 1,040 cases 24/2 tins Pure Apple-Strawberry Jelly and 720 cases 24/2 tins Pure Peach Preserves, and that on the 20th of November 1946, defendants shipped to plaintiff 667 cases 24/2 tins of Pure Apple-Strawberry Jelly and 908 cases 24/2 tins Pure Peach Preserves, for which plaintiff paid, upon receipt of the merchandise $12,319.89; that on or about January 2, 1947, 654 cases of the peach pre-

serves were inspected by representatives of the Pure Food and Drug Administration, Federal Security Agency of the United States and found to be misbranded in that there was a shortage in the net weight of the preserves, preventing their sale and resulting in a libel proceeding being instituted by the United States based upon the contention that said food was misbranded within the meaning of Title 21 U.S.C.A. § 343 (e) (2), in that the food failed to bear a label containing an accurate statement of quantity of contents; that upon the seizure of the food in the libel proceedings, defendants instructed the plaintiff to defend the actions and agreed to relabel the cans showing their true weight, so that the product could be released and sold; that plaintiff expended $328 in defense of the libel actions, said amount being made up of $88 court costs, $40 for bond premiums and $200 in attorneys' fees.

It was alleged that defendants had failed to relabel the merchandise, that same was unsalable and deteriorating in value, and alleged damage in the sum of $6,003.72, which amount added to the $328 expended in the libel proceedings aggregated the amount sued for—$6,331.72.

By amendment to the complaint, it was alleged that the sale was with an express warranty by the defendants that the goods were not adulterated, or misbranded within the meaning of the Federal Food, Drug, and Cosmetic Act and could be shipped in interstate commerce in accordance with the Federal, State and local laws.

It was alleged that there was an implied warranty that the merchandise was of merchantable quality and reasonably fit for the purpose for which the goods were purchased.

Defendant, M. M. Craddock, wife of B. F. Craddock, denied other allegations of the complaint, including all allegations that she was a partner in the business of Craddock Canning and Preserve Company.

Defendant B. F. Craddock, also denied that any partnership existed between himself and wife, averred that the business was owned solely by him; denied agreeing to defend the libel actions or to defray the expenses of so defending, but admitted his agreement with the Federal Security Agency of the Pure Food and Drug Administration to furnish labels and relabel the preserves. He contended in pleading that the plaintiff accepted the merchandise November 20, 1946, at Paducah, Kentucky, after having examined and inspected it and by his failure to notify the defendant of any alleged defects within a reasonable time after he knew or should have known of the shortage in weight that there was no liability on the part of defendant and that the agreement of sale was without any warranty as to quantity, quality, fitness or otherwise; contending in his testimony that the sale to the plaintiff of the preserves was made "as is, where is"; that his agreement to furnish corrected labels was a gratuity on his part in consideration of which plaintiff released defendant, if any in fact there had been, of any contention or claim on the part of plaintiff that defendant was liable.

On the pleadings and evidence, the following issues would appear to embrace all of the disputed questions between the parties—

1. Were the defendants B. F. Craddock and M. M. Craddock operating the business as partners, or was B. F. Craddock the sole owner thereof.

2. Was the contract breached by the shipment of 908 cases of preserves, when only 720 cases were ordered.

3. Was there an express warranty as to quality and quantity and if there was, has that warranty been breached.

4. Was there an implied warranty as to quality, quantity and fitness for resale and if so was the implied warranty breached.

5. Was there an enforceable agreement that the plaintiff should defend the libel suits filed by the Government and if so is the plaintiff entitled to reimbursement of the $328 expended by plaintiff in defense of that agreement.

6. Did the defendants breach the agreement to relabel the cans of preserves, thereby preventing plaintiff from selling the preserves until it had become unsalable by the delay.

The following—

### Findings of Fact.

are made from the evidence in the case upon the issues as above stated.

1. M. M. Craddock was not a partner with B. F. Craddock in the business operated under the name of Craddock Canning and Preserve Company.

Harvey Wolf, an employee of plaintiff, who conducted the negotiations to purchase the merchandise here involved, admitted he knew nothing about Mrs. Craddock's interest in the business, but stated that B. F. Craddock was seldom in the office.

John D. Driskill, Prosecuting Attorney in the Police Court at Paducah, Kentucky, testified concerning the prosecution in that Court, involving a warrant for violation of sanitary regulations against the defendant B. F. Craddock and stated that in the course of that prosecution he recalled that Mrs. Craddock said that she was a partner.

Mrs. Clara B. Dismukes, Director of the Paducah and McCracken County Health Service says that an attorney for B. F. Craddock advised her that Mrs. Craddock would operate the business and that the permit to operate was issued in the firm name of Craddock Canning & Preserve Company, but was delivered to Mrs. Craddock and that business matters were taken up by Mrs. Dismukes with Mrs. Craddock in the winter of '46 and '47, but that at no time did Mrs. Craddock state or pretend that she was a partner, and that she (the witness) knew that during a great part of this time that Mr. Craddock was confined in the hospital.

N. O. Story, an employee of the Health Department at Paducah, testified that during the strawberry season he dealt with Mrs. Craddock.

Homer Holland, another employee of the Health Department, said that he frequently contacted the company and that most of his business was conducted with Mrs. Craddock; that she handled executive matters.

John P. Murt, a plumbing inspector, had business with the company, which he conducted with Mrs. Craddock and stated that her conduct was such as to indicate that she was the head of the company.

Roy Futrell, foreman at the factory, regarded Mrs. Craddock from her conversation as the person in charge. He took orders from both Mr. & Mrs. Craddock and said that checks were signed by Mrs. Craddock and that through the winter of 1946 and 1947 Mr. Craddock was at the plant infrequently and that other employees regarded Mrs. Craddock as the "boss", during the extended periods of time that Mr. Craddock was not there.

Each of the defendants testified that Mrs. Craddock was not a partner and had no interest in the company; that in 1947, due to the ill health of her husband, she was practically in charge, but that she was only in charge by authority of her husband and because of his incapacity by illness; that both the defendant M. M. Craddock and Mrs. Mozelle Easley signed checks.

There is considerable testimony relative to the sale of the physical assets of the Craddock Canning and Preserve Company to Mrs. Craddock about May 15, 1947. This was not the transaction here involved and this testimony corroborates the contention of the defendants. This is not an action to question or to set aside a fraudulent conveyance. The fact that all of the physical assets, rather than a part thereof were sold indicates that Mr. Craddock owned all of the physical assets and that Mrs. Craddock was not claiming any interest therein.

The activity of Mrs. Craddock as an executive in the business during the time when her husband was ill and unable to be at the plant does not indicate any ownership in the assets or in the operation of the plant.

2. There was no breach of the contract for the sale of the preserves by the shipment of 908 cases upon an order for only 720 cases.

The correspondence filed in the case shows that upon the shipment of 908 cases of preserves, the Craddock Company notified plaintiff of the change and that the plaintiff paid defendant for the car as shipped.

3. There was no express warranty on the part of the defendant. The purchase

was made by telephone conversation and while there is an effort in the testimony to show that in such conversations plaintiff was advised that there was a great demand for the preserves and that he would have to buy them "as is, where is", the testimony is not convincing and is rejected.

There was an implied warranty that the merchandise involved was fit for sale and fit to be introduced for shipment into interstate commerce and that the goods were of merchantable quality.

The testimony that there was an express agreement that plaintiff purchased the preserves "as is, where is" and that the plaintiff was given an opportunity to inspect the goods at Paducah and by his failure to so inspect them precluded himself from claiming an implied warranty, is of little significance.

A great deal of this testimony is an attempt on the part of some of the employees of defendant to show that a sale of a product f.o.b. at the point of consignment, meants a sale without representation or warranty.

5. The correspondence from the defendant and the conduct of the parties immediately after and during the time the preserves were seized by the Government in the libel suits are conclusive that the defendant recognized responsibility for a shortage in weight and desired to secure a release of the property from libel to relabel same. Had he been able to secure the new labels and furnish them promptly, he would have thereby prevented the further deterioration of the merchandise and perhaps avoided a substantial part of the loss.

6. Defendant did agree to relabel the cans and after a long period was able to and did secure the labels. The difficulty which defendant had in securing the new labels may have been unavoidable, but it did not prevent the delay which resulted in the deterioration of the preserves, nor did it enable the plaintiff to secure the release of the merchandise from the custody of the Government.

7. The damages which plaintiff sustained are listed by the plaintiff as follows—

| | | |
|---|---|---|
| Cost of 540 cases of preserves at $9.18 including freight to Little Rock, Arkansas | | $4,957.20 |
| Salvage on sale of 540 cases | | 1,380.28 |
| Loss | | 3,576.92 |
| Cost of relabeling 540 cases | $143.64 | |
| Court costs, bond expenses and Attorneys fee | 328.00 | 471.64 |
| Total Loss | | $4,048.56 |

### Conclusions of Law.

The principles of law applicable and considered by the Court to a decision of the issues as they were stated, are concluded to be as follows—

1. The burden of proof as to partnership rested upon the plaintiff. "Where suit is brought against defendants as members of a partnership, and one of them denies his connection with the firm, the burden is on the plaintiff to show that he is a partner." Eichel v. Sawyer, C. C. Ky., 44 F. 845 (Affirmed 145 U.S. 636, 12 S.Ct. 980, 36 L.Ed. 859).

In Hardymon v. Glenn, D.C., 56 F.Supp. 269, 274, a case from this Court, Judge Miller thus stated the test to be applied by a Court to determine a partnership as follows—

"Whether or not a partnership actually exists depends essentially upon the real intention of the contracting parties and the terms of the partnership contract. As was said in Guthrie v. Foster, 256 Ky. 753, 755, 76 S.W.2d 927, 928 ' "strictly speaking, a partnership never arises by operation of law. It is a question of contract and intention, appearing from all the facts of the case" * * * "A partnership is a status arising out of a contract entered into by two or more persons, whereby they agree to share as common owners the profits of a business carried on by all or any of them on behalf of all of them." ' "

In Crider v. Providence Coal Mining Co., 242 Ky. 514, 46 S.W.2d 1072, 1073, the Court of Appeals quoted with approval the following excerpt from Meehan v. Valen-

tine, 145 U.S. 611, 12 S.Ct. 972, 36 L.Ed. 835—"The test was often stated to be whether the person sought to be charged as a partner took part of the profits as a principal, or only as an agent."

The Court continued—"In Boreing **v.** Wilson, 128 Ky. 570, 108 S.W. 914, it was held that, while profit sharing was not a conclusive test of partnership, it was important as evidence tending to prove the relation, since an agreement to share profits was an essential element of every partnership, and its absence conclusive proof that a partnership did not exist."

In Berry v. Callahan, 15 Ky. Law Rep. 539, the Court said—"No person can be fixed with a liability on the ground that he has been held out as a partner, unless the holding out was done by him or with his consent, and was, before the contract was entered into, known to the person seeking to avail himself of it." See Rodgers **v.** Roland, 309 Ky. 824, 219 S.W.2d 19.

■ There is no proof in this record that there was any contract or agreement between B. F. Craddock and M. M. Craddock; no showing of community of interest in the property or profits, or that at any time, either of the partners told any one in the Porter Company that they were partners. On the other hand, Mr. Wolf, of the Porter Company, admits that he knew nothing about the actual relationship as between Mr. and Mrs. Craddock.

■ II. The shipment by the defendant and the acceptance by the plaintiff of the 908 cases of preserves upon an order for only 720 cases was not a breach of the contract. The acceptance, retention and payment without complaint, for the additional 188 cases shipped over the amount ordered, constitutes a change in the contract by mutual conduct.

In 46 American Jurisprudence page 400, there is this rule—"In this regard, the Uniform Sales Act provides that 'where the seller delivers to the buyer a quantity of goods larger than he contracted to sell, the buyer may accept the goods included in the contract and reject the rest, or he may reject the whole. If the buyer accepts the whole of the goods so delivered, he must pay for them at the contract rate.'"

■ III. The existence of an express warranty is purely a matter of contract and having found as a fact that there was no express warranty and no agreement that the goods were to be sold "as is, where is", there is eliminated any legal question upon an alleged express warranty.

■ IV. There was, however, an implied warranty on the goods sold.

K.R.S., Section 361.150 provides that where the buyer expressly or by implication makes known to the seller, the particular purpose for which the goods are required and relies upon the seller's skill or judgment (whether he be the grower or manufacturer), there is an implied warranty that the goods are reasonably fit for such purpose. This section also provides that where the goods are bought by description from a seller who deal in goods of that description (whether he be grower or manufacturer or not) there is an implied warranty that the goods shall be of merchantable quality. See Balfour-Guthrie Co. v. L. S. DuBois Son & Co., 245 Ky. 640, 54 S.W.2d 13; McNabb v. Central Kentucky Natural Gas Co., 272 Ky. 112, 113 S.W.2d 470.

In the case of Frick Co. v. Wiley, 290 Ky. 665, 162 S.W.2d 190, 191, the Court said—"The contract of sale contained a warranty that the thresher sold to appellee was well built, of good material and, when properly operated under like conditions, would perform as well as any other machine of the same size and rated capacity; but neither the warranty nor any other provision of the contract, in terms or by necessary implication, excluded the implied warranty created by the common law and expressed by Kentucky Statutes, § 2651b-15 (now K.R.S. 361.150) where the buyer relies on the seller's skill or judgment and the seller is aware of the purpose for which the goods are required—that the article sold is reasonably suited to the use intended. Formerly it was generally held that the existence of an express warranty excluded all implied warranties; * * * but since the enactment of the Uniform

Sales Act, at least, the recognized rule has been that the implied warranty exists unless it is excluded by express language or by necessary implication."

Introduction by the plaintiff in interstate commerce of misbranded food constituted a breach of the warranty.

In the case of Kordel v. United States, 335 U.S. 345, 347, 69 S.Ct. 106, 108, the Court said—"Section 301(a) of the Act prohibits the introduction into interstate commerce of any drug that is adulterated or misbranded. (Federal Food, Drug, and Cosmetic Act of June 25, 1938, 21 U.S.C.A. § 301 et seq.) It is misbranded according to Section 502(a) [21 U.S.C.A. § 352(a)] if its 'labeling is false or misleading in any particular', unless the labeling bears 'adequate directions for use'. § 502(f). The term labeling is defined in § 201(m) [21 U.S.C.A. § 321(m)] to mean 'all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.'"

In the case of Myers v. Malone & Hyde, 8 Cir., 173 F.2d 291, 295, the Court referring to its opinion in Smith v. Great Atlantic & Pacific Tea Co., 8 Cir., 170 F.2d 474 said— "Our holding was that the Uniform Sales Act means that a seller who deals in a certain food impliedly warrants under section 15(2) of the Act to one who buys such food from him that the food shall be of merchantable quality, and that the seller is liable for breach of such warranty. * * * But being misbranded they were subject to confiscation by the United States and could not be legally held or sold by the buyer. They were contraband under the law of the United States and as such they were not merchantable.

"Therefore as a matter of law there was the same actionable breach of implied warranty on the part of Center in his sale of the goods to Myers for interstate transportation as there was on Myers's part in its sale of the same goods in the same commerce to the plaintiff."

See Bobs Candy & Pecan Co. v. McConnell, 140 Tex. 331, 167 S.W.2d 511, holding that where merchandise is shipped to a retail dealer to be resold and he has no opportunity to inspect it, there is an implied warranty that the goods are in condition to stand shipment and will be in condition for resale on arrival at destination.

Craddock, knowing that the purchaser was securing the goods for resale to the plaintiff's retail trade, when apprised that the goods were seized by the United States and determined to be misbranded and contraband, breached his implied warranty that the goods were merchantable. Having breached the implied contract, he must respond in damages to the plaintiff, who promptly notified him of the seizure, and elected, as he had the right to do, to keep the merchandise when Craddock agreed to bear the expense of securing their release from libel and to relabel them.

V. The expense incurred by the plaintiff in the libel proceedings, seeking to secure the right to relabel and have the merchandise released, was incurred upon Craddock's request and upon his assurance to the plaintiff that he would reimburse him for the expenses incurred. The same conclusion applies to the expense incurred in relabeling the goods. See Plumbers Supply Co. v. Lanter, 280 Ky. 523, 133 S.W.2d 739.

In the case of Moss v. Yount, 296 Ky. 415, 177 S.W.2d 372, 375, 141 A.L.R. 441, the Court said—"Defendant—if there existed either an express or implied warranty —was thereby authorized to make reasonable efforts to restore the purchased article to a condition where it would serve the purpose for which it was bought and intended to be appropriated by him, and his expense while making such reasonable effort, would become the proximate result of a breach of either the express or implied warranty, if one existed."

See Accumulator Co. v. Dubuque Co., 8 Cir., 64 F. 70, Union Iron Worker v. Spottswood, 5 Cir., 141 F. 834, and Annotations in 151 A.L.R. 441; Myers v. Malone, supra.

VI. Plaintiff is entitled to recover from defendant, B. F. Craddock, $4,048.56 and judgment for that amount against the defendant, B. F. Craddock, will be tendered by Counsel for plaintiff.

VII. The complaint as to M. M. Craddock is dismissed and she is awarded her costs in this action expended.

VIII. The Court has jurisdiction of the parties and the subject matter. Title 28 U.S.C.A. § 1332.